Cheryl **HARDY**, Plaintiff and Appellant,

v.

The **PRUDENTIAL INSURANCE COMPANY OF AMERICA**; Wayne L. Rigby, Insurance Agent, Defendants and Appellees.

No. 20582.

Supreme Court of Utah.

Aug. 24, 1988.

Rehearing Denied Nov. 9, 1988.

Dan S. Bushnell, Merrill F. Nelson, Salt Lake City, for plaintiff and appellant.

Richard Ferrari, Salt Lake City, for defendants and appellees.

BILLINGS, Court of Appeals Judge:

Cheryl Hardy appeals from a summary judgment denying her recovery under a life insurance policy issued by Prudential Insurance Company of America ("Prudential") on her deceased husband. We reverse and remand.

## FACTUAL BACKGROUND

On appeal, we review the facts and inferences reasonably drawn therefrom in the light most favorable to the party against whom summary judgment was granted. *Payne ex rel. Payne v. Myers,* 743 P.2d 186, 187–88 (Utah 1987); *Atlas Corp. v. Clovis Nat'l Bank,* 737 P.2d 225, 229 (Utah 1987); *K.O. v. Denison,* 748 P.2d 588, 590 (Utah Ct.App.1988). Therefore, we recite the facts from appellant's point of view.

Lynn Hardy was a truckdriver. In 1977, Lynn and Cheryl Hardy established their own trucking operation. Over time, they acquired five trucks and eight trailers. Prudential's selling agent, Wayne Rigby, assisted Lynn and Cheryl in applying for a $300,000 mortgage life insurance policy on Lynn to pay the debt on the trucking business in the event of his death. Cheryl, the appellant in this case, was the named beneficiary.

On August 4, 1981, Rigby brought a life insurance application to the Hardy home. Rigby asked Lynn the questions contained in Part 1 of the application and recorded Lynn's answers. During this question-and-answer exchange, Lynn informed Rigby of a heart attack he had suffered on January 5, 1974, seven years earlier. Rigby responded that the heart attack would not affect issuance of the policy and that this information did not have to be included on the application because it was Prudential's practice to disregard medical conditions more than five years old.

Part 2 of the application focused on the applicant's medical history and required the applicant to undergo a physical examination. Initially, Part 2 of Lynn's application was completed by a paramedic. Relying on Rigby's assurances that he need not disclose his 1974 heart attack, Lynn did not tell the paramedic about it. However, Lynn disclosed that two of his brothers had died from heart attacks, that he was a heavy smoker, and that he was physically examined by Dr. G.W. Taylor in 1979 for the Department of Transportation. At the paramedic's request, Lynn had an electrocardiogram. Lynn signed Part 2 of the application, authorizing Prudential to obtain his medical records.

As was customary, Prudential's underwriting department investigated Lynn's physical and financial history before making a final decision on his insurance application. This independent investigation confirmed that Lynn smoked two packs of cigarettes per day. It also revealed the name of another attending physician, Dr. Peterson. In addition, Prudential discovered that another of Lynn's living brothers suffered "heart problems." As part of its investigation, Prudential asked Dr. Taylor, the physician who physically examined Lynn for the Department of Transportation, to complete an "attending physician's statement" ("APS"). The APS revealed no cardiovascular information. Meanwhile, the underwriting department received the results of Lynn's electrocardiogram, which showed that Lynn suffered from a first-degree atrioventricular ("AV") heart block.

Three days after receiving Lynn's application, the underwriting department discovered that Part 2 of the application had been completed by a paramedic rather than a physician, as required by the requested policy amount. Consequently, Part 2 was completed again, the second time by Dr. Joseph R. Evans. Again relying on Rigby's assertion that Lynn need not disclose the 1974 heart attack, Lynn did not inform Dr. Evans of the incident. Nonetheless, Lynn verified that he had smoked for twenty years; that he had suffered from rheumatic fever as a child; that he had physical examinations every two years for the Department of Transportation, including a recent examination by Dr. Jay Capener; and that he was treated for a prostate condition by Dr. Val Sundwall at Cottonwood Hospital, the same hospital that treated him for his 1974 heart attack. Dr. Evans' examination of Lynn disclosed no current cardiovas-

cular infirmity. Again, Lynn signed Part 2 of the application, authorizing Prudential to procure his medical records from any one of the named sources.

Based upon the information accumulated, Prudential's underwriting department initially recommended assigning Lynn a special class 1 rating to account for the higher risk. However, Prudential chose to issue a standard policy, concluding that Lynn was "standard physically." Contemporaneously with this determination, the underwriting department discovered that, because three members of Lynn's family had died prematurely from coronary conditions, Dr. Evans should have requested that Lynn have a chest x-ray taken. Consequently, a chest x-ray was performed. However, before the results were received, the sixty-day deadline for ruling on the application had passed. No further investigation was conducted, and Lynn's application was approved "standard."

Lynn Hardy died of a myocardial infarction on December 4, 1982, fourteen months after the policy was issued and within the two-year contestability period. Appellant, Lynn's widow and named beneficiary, filed her "Claim for Insurance Contract Benefits" on December 15, 1982. Upon receipt of appellant's claim, Prudential ordered a "contestable investigation." This investigation revealed information which led Prudential to investigate records at the University of Utah Medical Center and Cottonwood Hospital. Ultimately, the investigation uncovered records of Lynn's 1974 heart attack.

Upon receipt of the investigator's report, Prudential's claims department deliberated in excess of one and one-half months over whether to deny appellant's claim. The issue was ultimately submitted to Prudential's corporate headquarters in New Jersey. A senior claim consultant determined that an exception to the "five-year rule" should be made in this case and that the claim should be denied for Lynn's failure to disclose his 1974 heart attack. This consultant, however, acknowledged that Prudential could not rescind the policy based on Lynn's purported misrepresentation if Prudential was "on notice" to conduct an inquiry that would have revealed his 1974 heart attack.

As a result of Prudential's denial of her claim, appellant instituted this action against Prudential, alleging (1) breach of the insurance contract, resulting in the loss of the Hardy trucking operation; (2) bad faith denial of the insurance claim, justifying an award of consequential damages for emotional suffering, punitive damages, and attorney fees; and (3) intentional infliction of emotional distress. Prudential counterclaimed for rescission of the policy based upon Lynn's failure to disclose his 1974 heart attack.

After substantial discovery on the merits of Prudential's cross-claim for rescission, Prudential filed a motion for summary judgment. Appellant defended by asserting (1) that Lynn's prior heart attack was disclosed to agent Rigby and, relying on Rigby's representations, Lynn subsequently reasonably omitted reference to the 1974 heart attack in the insurance application process; and (2) that Prudential is equitably estopped from raising the affirmative defense of misrepresentation as to the heart attack and any subsequent treatment incident thereto because Prudential was put on notice to conduct an inquiry that, had such an inquiry been reasonably performed, would have revealed the heart attack and any attendant follow-up treatment.

The lower court granted Prudential's motion, concluding as a matter of law that both Lynn and appellant had failed to disclose Lynn's 1974 heart attack and subsequent medication and treatment for his heart condition. Appellant asked the trial court to reconsider its ruling, pursuant to Rule 60(b) of the Utah Rules of Civil Procedure, arguing that the court mistakenly relied on misinformation furnished by Prudential. In support of its Rule 60(b) motion, appellant submitted the affidavit of Dr. Joseph L. Thorne, which stated that Lynn's heart condition was in remission and asymptomatic in the years subsequent to his heart attack and that Lynn was not taking medication to treat his heart nor

was he under any other treatment. The court reexamined its initial ruling but reaffirmed its prior decision. Appellant filed this appeal, challenging the trial court's summary judgment order.

## STANDARD OF REVIEW

After reviewing the facts in the light most favorable to appellant, if we conclude there is a dispute as to a material issue of fact, we must reverse the trial court's determination and remand to the trial court on that issue. *Atlas,* 737 P.2d at 229; *Denison,* 748 P.2d at 590. Courts cannot weigh disputed material facts in ruling on a summary judgment motion. *Spor v. Crested Butte Silver Mining, Inc.,* 740 P.2d 1304, 1308 (Utah 1987); *Oberhansly v. Sprouse,* 751 P.2d 1155, 1157 (Utah Ct.App. 1988). "It is of no moment that the evidence on one side may appear to be strong or even compelling." *Spor,* 740 P.2d at 1308; *Oberhansly,* 751 P.2d at 1157. "It only takes one competent sworn statement under oath to dispute the averments on the other side of the controversy and create an issue of fact." *W.M. Barnes Co. v. Sohio Natural Resources Co.,* 627 P.2d 56, 59 (Utah 1981) (quoting *Holbrook Co. v. Adams,* 542 P.2d 191, 193 (Utah 1975)).

## UTAH CODE ANN. § 31–19–8 (1974)

The first issue on appeal is whether the trial court was correct in concluding as a matter of law that Lynn *and* appellant's failure to disclose Lynn's 1974 heart attack and alleged follow-up treatment justified rescission of the insurance policy.[1] Section 31–19–8(1) delineates what Prudential must establish in order to avoid liability on its

issued policy.[2] Section 31–19–8 provides in relevant part:

(1) All statements and descriptions in any application for an insurance policy or annuity contract, or for the reinstatement or renewal thereof, by or in behalf of the insured or annuitant, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless:

(a) fraudulent; *or*

(b) material either to the acceptance of the risk, or to the hazard assumed by the insurer; *or*

(c) the insurer in good faith either would not have issued, reinstated or renewed it at the same premium rate, or would not have issued, reinstated, or renewed a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

(Emphasis added).

Appellant argues that the applicant's misrepresentation, omission, or incorrect statement of fact contemplated by section 31–19–8 must be made with an intent to deceive *and* must be material, *and* Prudential must have indeed relied upon the purported misrepresentation before Prudential escapes liability on its policy. However, in support of this conjunctive construction of section 31–19–8, appellant relies on cases that were decided under the

---

1. The trial court specifically found that both Lynn *and* appellant had failed to disclose Lynn's 1974 heart attack and subsequent treatment to the investigator acting on Prudential's behalf. Our analysis focuses on Lynn's alleged misrepresentations, but it is equally applicable to any alleged misrepresentation of appellant. Prudential has not identified any additional or unique omissions or misrepresentations made by appellant. We thus consider Lynn's and appellant's purported misrepresentations collectively but

refer only to Lynn's. We do not find it necessary in resolving this case to analyze the legal impact of appellant's alleged misconduct independent of Lynn's conduct.

2. Utah Code Ann. § 31–19–8 (1974) was repealed in its entirety following the commencement of this action. 1985 Utah Laws ch. 242, § 58. It has been replaced by the enactment of the Utah Insurance Code, effective July 1, 1986. 1986 Utah Laws ch. 204, § 138 (codified at Utah Code Ann. § 31A–21–105 (1986)).

predecessor to section 31–19–8.[3] *See Marks v. Continental Casualty Co.,* 19 Utah 2d 119, 427 P.2d 387 (1967); *Pritchett v. Equitable Life & Casualty Ins. Co.,* 18 Utah 2d 279, 421 P.2d 943 (1966); *Wootton v. Combined Ins. Co.,* 16 Utah 2d 52, 395 P.2d 724 (1964). Our cases decided under section 31–19–8, as it existed at the time of this action, have sanctioned a disjunctive interpretation. *See, e.g., Moore v. Prudential Ins. Co.,* 26 Utah 2d 430, 436, 491 P.2d 227, 231 (1971) (court approves trial court's jury instructions which recited the conditions in section 31–19–8 disjunctively).

While the appeal in this case was pending, we directly confronted the issue of whether the alternative subsections enumerated in section 31–19–8 are conjunctive or disjunctive. *Berger v. Minnesota Mut. Life Ins. Co.,* 723 P.2d 388, 390 (Utah 1986). In *Berger,* we determined:

> The statutory alternatives are stated in the disjunctive, not the conjunctive. In order to invalidate a policy because of misrepresentation by the insured, an insurer need prove applicable only one of the above provisions.

*Id.*[4] Therefore, the insurer must prove that the misrepresentation was made with the intent to deceive *or* that the matter misrepresented was material *or* that the insurer in good faith would not have issued the policy if the true facts had been made known to the insurer. Our construction is consistent with other courts interpreting similar statutory schemes.[5] We note, however, that we have not found a case, under the statute relevant here, where the insurer argued that it should escape liability because the alleged misrepresentation was made with an intent to deceive but was material neither to acceptance of the risk nor to the issuance of the policy. This hypothetical but troubling construction is thus of little realistic concern as the cases consistently focus on materiality and reliance. Furthermore, this possible construction is eliminated by the enactment of the new Insurance Code, which replaced section 31–19–8. The new statute requires reliance or causation of loss in all situations.[6]

## MISREPRESENTATION

Initially, Prudential denied appellant's claim under the policy, claiming that Lynn failed to disclose his 1974 heart attack on

---

**3.** The predecessor to Utah Code Ann. § 31–19–8 (1974), Utah Code Ann. § 31–19–8(1) (1953) (repealed 1963 Utah Laws ch. 45, § 3), provided in pertinent part:

> (1) Except as provided in subsection (2), no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or avoid the contract or prevent it attaching, unless such misrepresentation or warranty is made with the intent to deceive.

**4.** We concede that there is language in *Fuller v. Director of Fin.,* 694 P.2d 1045, 1048 (Utah 1985), which might be read as being contrary to the conclusion we reach today. However, *Fuller* is distinguishable from the instant case since it involved insurance coverage under Utah's workers' compensation scheme and no claim or defense under section 31–19–8 was raised either on appeal or in the trial court.

**5.** Several states have statutes similar to Utah's former section. *See, e.g.,* Ala.Code § 27–14–7 (1986); Alaska Stat. § 21.42.110 (1987); Ariz. Rev.Stat.Ann. § 20–1109 (1975); Ark.Stat.Ann. § 23–79–107 (1987); Idaho Code § 41–1811 (1977); Me.Rev.Stat.Ann. tit. 24–A, § 2411 (1974); Md.Code Ann. § 374 (1986); Mont.Code Ann. § 33–15–403 (1987); Or.Rev.Stat. § 743.042 (1987); S.D. Codified Laws Ann. § 58–11–43 (1978). The majority of these jurisdictions have interpreted the provisions in the disjunctive, thereby holding that the statutes furnish three independent grounds for the rescission of a policy. *See, e.g., Stephens v. Guardian Life Ins. Co.,* 742 F.2d 1329, 1332–33 (11th Cir.1984) (applying Alabama law); *National Sav. Life Ins. Co. v. Dutton,* 419 So.2d 1357, 1360–61 (Ala.1982); *Jackson v. Prudential Ins. Co.,* 736 F.2d 450, 453 (8th Cir.1984) (applying Arkansas law); *Industrial Indem. Co. v. United States Fidelity & Guar. Co.,* 93 Idaho 59, 454 P.2d 956, 959 (1969). *But see American Home Assurance Co. v. Ingeneri,* 479 A.2d 897, 899–900 (Me.1984).

**6.** Section 31A–21–105 provides in pertinent part:

> (2) Except as provided in subsection (5), no misrepresentation or breach of an affirmative warranty affects the insurer's obligations under the policy unless:
> (a) the insurer *relies on it* and it is either material or is made with intent to deceive; or
> (b) the fact misrepresented or falsely warranted *contributes to the loss.*

Utah Code Ann. § 31A–21–105 (1986) (emphasis added).

Part 2 of the insurance application. Prudential later claimed that Lynn failed to disclose that he was taking medication and otherwise being treated for his heart condition at the time of his application.

Appellant concedes that Lynn did not disclose his 1974 heart attack on Part 1 of the application. However, there is competent, though admittedly conflicting, evidence in the record supporting appellant's contention that Lynn disclosed the 1974 heart attack to Rigby, Prudential's selling agent. Three persons—namely, appellant; Jan Hardy, appellant's daughter-in-law; and Marth Ith, appellant's son—all swore under oath that Lynn disclosed his 1974 heart attack to Rigby and that Rigby responded by saying that the incident was irrelevant because medical history older than five years was not required. Because of Rigby's response, appellant claims, Lynn reasonably chose not to inform other Prudential agents of his 1974 heart attack. In light of this evidence, the question we must address is the effect of Rigby's knowledge and advice on Prudential.

■ Prudential does not dispute that, as a general rule, knowledge of an agent of the insurer, while acting within the scope of his or her authority, is imputed to the insurer, whether communicated or not. *Major Oil Corp. v. Equitable Life Assurance Soc'y*, 457 F.2d 596, 604 (10th Cir. 1972); *Lumbermens Mut. Ins. Co. v. Bowman*, 313 F.2d 381, 388 (10th Cir.1963); G. Couch, *Cyclopedia of Insurance Law* §§ 26:133–34 (2d rev. ed. 1984). In its claims manual, Prudential acknowledges that courts generally impute any knowledge of the agent to the company under the law of agency. Prudential contends, however, that this case fits within the exception to the general rule, namely, that the knowledge of the agent is not imputed to the principal where the *agent's duties* or apparent duties have no connection with the subject matter to which the knowledge relates. *Roderick Timber Co. v. Willapa Harbor Cedar Prod. Inc.*, 29 Wash.App. 311, 627 P.2d 1352, 1355 (1981); Restatement (Second) of Agency § 268 comment c (1958). Prudential maintains that even if Lynn did disclose his 1974 heart attack to Rigby, Rigby's knowledge would not be imputed to Prudential because Rigby was acting outside the scope of his responsibility in taking Lynn's medical history or giving him advice as to what items were relevant. According to Prudential, Rigby's responsibility is to sell insurance, not to underwrite the policy.

■ The facts in the record do not support Prudential's position. There are facts from which one *could* reasonably conclude that Rigby was acting within his scope of authority in inquiring about Lynn's medical history. Part 1 of the application, which Rigby is authorized to complete and in fact did complete for Lynn, contains questions concerning the applicant's medical history. It was in the process of Rigby's completing Part 1 that the alleged exchange about the heart attack and the five-year rule occurred.

Prudential's own practice, as evidenced by its handling of other claims, indicates that Rigby was acting within his scope of authority as a selling agent when he was told of the 1974 heart attack and when he advised Lynn that it need not be disclosed because of the five-year rule. For example, in Claim No. NOD815009, Prudential paid a claim despite material misrepresentations in the application because a Prudential agent knew of the omitted medical history:

Based on the agent's knowledge of the insured's kidney disease, which legally can be imputed to the Company, would suggest making payment of death benefits to [beneficiary]. Agent's knowledge would seem to estop us from claiming reliance on a material misrepresentation.

Similarly, in Claim No. NOD89484, Prudential's claims department concluded:

Because it is apparent that Agent Painter ... was also cognizant of the insured's poor health at the time he took the applications, we have dropped our misrepresentation action and are accepting full death claim liability of $47,000.

Furthermore, Prudential does not dispute that an insurer is generally bound by an incorrect answer entered onto the applica-

tion by or at the direction of the agent following disclosure of the true facts by the applicant. *Lazar v. Metropolitan Life Ins. Co.*, 290 F.Supp. 179, 181 (D.Conn. 1968); *Central Nat'l Life Ins. Co. v. Peterson*, 23 Ariz.App. 4, 529 P.2d 1213, 1215–16 (1975); *Roy v. Trans–World Life Ins. Co.*, 199 So.2d 416, 418 (La.Ct.App.1967); J. Appleman, *Insurance Law and Practice* § 9410 (1981). However, Prudential argues that the written provisions of the application provide that Rigby could not alter the insurance contract or waive contract provisions contained in the application. Specifically, the insurance application provided that an agent could not waive Prudential's "rights or needs" and that "only a Prudential officer may agree to modify this contract, and then only in writing."

■ Where there is a dispute over the authority of the agent to waive a policy term, the question is one of fact for the jury. *ACF Produce, Inc. v. Chubb/Pacific Indem. Group*, 451 F.Supp. 1095, 1099 (D.Pa.1978). Moreover, insurance companies can be estopped from invoking these boilerplate nonwaiver provisions if the insured reasonably relied upon the agent's representations to the contrary. *See, e.g., Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 682 P.2d 388, 395, 400–01 (1984); *Lewis v. Continental Life & Accident Co.*, 93 Idaho 348, 461 P.2d 243, 246 (1969); G. Couch, *Cyclopedia of Insurance Law* § 71:4 (2d rev. ed. 1984). Agency law principles prevail, under these circumstances, over nonwaiver provisions. *See Paulson v. Western Life Ins. Co.*, 292 Or. 38, 636 P.2d 935, 948 (1981) ("neither the policy nor the application can limit the existing agency relationship"); *Service v. Pyramid Life Ins. Co.*, 201 Kan. 196, 440 P.2d 944, 954 (1968) (agent can waive condition of an insurance policy even if the policy contains a printed stipulation to the contrary). Prudential's own policy manual acknowledges this authority, stating:

> Even though our policies and applications contain text to the effect that no agent has the right to modify the contract, or to pass on insurability, or waive any

rights or requirements, the courts are generally reluctant to enforce such language and in the absence of actual collusion would generally impute any knowledge of the agent to the company.

There is ample authority to support appellant's position that Lynn's alleged reliance on Rigby's representation that Lynn's heart attack was irrelevant and Lynn's consequent nondisclosure of the incident to other prudential agents would defeat Prudential's claim of rescission. *See, e.g.,* J. Appleman, *Insurance Law and Practice* § 9410 (1981) ("an insured is usually justified in relying upon the advice and assistance of a soliciting agent in preparing his application"); *Central Nat'l Life*, 529 P.2d at 1215 (insured informed insurance agent of prior hospitalization, but agent told insured that occurrence need not be included on application because it "was not necessary to go back any further than five years"); *Lazar*, 290 F.Supp. at 181 (insurance company bound by agent's explanation that certain medical history was not required by application).

Under the prior authority, the determination of whether Prudential can establish that Lynn was not justified in failing to disclose his heart attack to agents other than Rigby is a question for the fact finder and cannot be determined as a matter of law on the record before us.

The trial court seemed to rely on the fact that Lynn did not disclose his alleged medical treatment for the 1974 heart attack, which purportedly occurred within the five years preceding Lynn's application. However, there were material issues of fact before the court as to whether Lynn was receiving treatment. Dr. Thorne's sworn affidavit stated that Lynn's condition was asymptomatic and that Lynn was not under treatment for the heart condition.

When the facts and the reasonable inferences therefrom are viewed in a light most favorable to appellant, there are genuine issues of material fact as to whether Lynn misrepresented his health by failing to disclose to Prudential either his 1974 heart attack or any subsequent treatment.

In light of our holding that the trial court was incorrect in ruling as a matter of law that Lynn made a misrepresentation in the application process, we need not resolve whether the misrepresentation, if any, was (a) fraudulent *or* (b) material, *or* (c) whether Prudential, in good faith, would have issued the policy if it had known the truth. However, on remand, if the fact finder determines that Lynn did misrepresent his medical history in the application process, these issues must be resolved. Therefore, in order to provide guidance to the trial court, we briefly discuss these alternative provisions in section 31–19–8(1).

## FRAUD

■ Our cases have discussed the issue of fraud in the insurance application context. We have said, "Mere falsity of answers to questions propounded are insufficient [to defeat coverage] if not knowingly made with intent to deceive and defraud." *Burnham v. Bankers Life & Casualty Co.*, 24 Utah 2d 277, 281, 470 P.2d 261, 263 (1970); *Wootton*, 16 Utah 2d at 55, 395 P.2d at 725. However,

> "[i]f the insured at the time of making his application for a policy has knowledge or good reason to know that he is afflicted with a disease that renders his condition serious, and that thereby his longevity will be prejudicially impaired, his statements and representations to the contrary in reply to specific inquiries constitute a fraud practiced upon the insurer, and which, when successfully proven, invalidates the policy."

*Prudential Ins. Co. v. Johnson*, 22 Utah 2d 66, 68–69, 448 P.2d 722, 723 (1968) (quoting *Chadwick v. Beneficial Life Ins. Co.*, 56 Utah 480, 191 P. 240, 245 (1920)). Furthermore, advice from an agent that certain medical history need not be declared is relevant as to whether the insured had an intent to deceive. *Prudential Ins. Co. v. Willsey*, 214 F.2d 729, 732 (10th Cir.1954). The question of intent to defraud is an issue for the fact finder unless the facts are undisputed. J. Appleman, *Insurance Law and Practice* § 7297 (1981).

■ We are not persuaded that the issue of whether Lynn's intent to deceive Prudential can be decided as a matter of law upon the record before us. Lynn, as previously discussed at length, volunteered information about his 1974 heart attack to agent Rigby. He apparently gave other damaging information to Prudential, such as his family's history of heart disease, his childhood rheumatic fever, and his long-term heavy smoking. He also disclosed the names of hospitals and attending physicians from whom Prudential could have discovered his 1974 heart attack. Moreover, Lynn underwent two physical examinations, an electrocardiogram, and a chest x-ray, evidencing that he *may* not have intentionally deceived Prudential.

The facts, although disputed, could support the conclusion that Lynn honestly believed he had recovered from the 1974 attack and thus was not undergoing treatment for this condition within the five-year rule which he understood was determinative. Lynn was released from the hospital in "good condition" merely ten days after suffering the attack. Within one month of the attack, he was walking one mile per day and had resumed driving trucks. His heart ailment was thereafter considered asymptomatic by his treating physician. In 1979, nearly five years after the attack, tests conducted on Lynn indicated that his blood pressure, lungs, heart sounds, and cardiovascular data were "normal." The only abnormality discovered in 1979 was Lynn's high cholesterol level, for which he was taking atromid. Clinic notes taken by an attending physician on January 2, 1980, confirmed these positive findings. Dr. David Sundwall, the physician who treated Lynn for the 1974 attack, examined Lynn three years after the attack and concluded that he was no longer experiencing any cardiovascular problem. Lynn's last Department of Transportation physical examination, conducted on August 7, 1981, revealed normal cardiovascular findings.

## MATERIALITY

■ A fact is material to the risk assumed by an insurance company if reason-

able insurers would regard the fact as one which substantially increases the chance that the risk insured against will happen and therefore would reject the application. *Burnham*, 24 Utah 2d at 281, 470 P.2d at 263.

On the record before us, we cannot say that Lynn's misrepresentations as to his heart condition were material as a matter of law. Appellant should be allowed to present to the fact finder her arguments that (1) Prudential still would have issued the policy; (2) as a matter of policy and practice, Prudential disregards medical history that is more than five years old; and (3) Prudential waived assigning Lynn a special class rating despite the information it had.

### EQUITABLE ESTOPPEL

Under our analysis of Prudential's equitable estoppel defense, we also discuss whether the trial court was correct in ruling as a matter of law that Prudential in good faith would not have issued the policy had Lynn's prior medical history been revealed, as the two issues are factually and legally similar.

Appellant argued below that Prudential had sufficient facts concerning Lynn's health to put it on notice to conduct an investigation into Lynn's medical history which, if the investigation was reasonable, would have revealed Lynn's 1974 heart attack and any subsequent treatment. The trial court denied this affirmative defense as a matter of law.

■ An insurance company cannot escape liability on a policy if it is established that there should have been no actual reliance on the applicant's misrepresentation, concealment, or omission. *Major Oil Corp.*, 457 F.2d at 602 (applying Utah law); *New York Life Ins. Co. v. Strudel*, 243 F.2d 90, 93 (5th Cir.1957). There are two corollaries to this rule which, if shown, prevent the insurer from escaping liability: (1) if the insurer has information which would have put a prudent person on notice of possible falsity and would have caused an inquiry which, if carried out with reasonable diligence, would have revealed the truth, the insurer cannot rely on the misrepresentation; and (2) if the insurer chooses to make an independent inquiry and a reasonable search would have uncovered the misrepresentation but the facts were not discovered because the investigation was cursory, the insurer cannot rely on the misrepresentation. *Major Oil Corp.*, 457 F.2d at 602. An insurance company is charged with facts which it ought to have known and cannot "blind itself from ascertaining the truth and then claim wilful misrepresentation of the truth on which it relied in order to avoid payment under policy." *Id.* at 603; *see also Wootton*, 16 Utah 2d at 56, 395 P.2d at 726. Moreover, if it is determined that the insurer discovered the omitted medical history without substantial hardship *after* the insured's death, this fact bears on the question of whether a reasonable investigation before issuance of the policy would have revealed the same history. *Major Oil Corp.*, 457 F.2d at 604.

■ There are sufficient facts in the record to persuade us that the trial court should not have denied appellant's claim that Prudential was equitably estopped from denying liability as a matter of law. In completing Part 2 of the insurance application, the paramedic learned that Lynn's father and two brothers died at relatively young ages from heart attacks; that Lynn's mother died of a stroke; that one brother committed suicide; that three other brothers and a sister died at birth; and that he was a heavy smoker, as well as the names of previous attending physicians. Prudential's underwriting department's independent investigation disclosed additional information: it confirmed Lynn's heavy smoking habit and revealed not only that one of Lynn's brothers, still living, also suffered from heart problems, but also the name of yet another attending physician.

When Part 2 of the insurance application was completed by Dr. Evans, Prudential learned even more information: that Lynn had smoked heavily for twenty years; that he had rheumatic fever as a child; that he recently was examined by Dr. Capener; and that he previously had been treated at

771

Cottonwood Hospital, the hospital which treated Lynn for his 1974 heart attack. The tests Lynn undertook as part of completing the application revealed that Lynn had a first degree AV block.

Finally, if Lynn's statement to Rigby that he had a heart attack in 1974 is imputed to Prudential, then it stands to reason that Prudential had actual knowledge of the very fact of which it now complains. After Lynn died, Prudential quickly discovered his 1974 heart attack by following-up on leads gleaned from his application.

Indeed, Prudential has conceded on previous occasions that it could not rescind a policy based upon misrepresentations in the application because it failed to procure medical information after possessing leads. For example, in Claim No. NOD085449, Prudential paid the claim despite a misrepresentation because of its admitted failure to procure available medical records:

> Underwriter's comment on reverse of Part I indicates that there was a basis for requesting an [attending physician's statement], but he opted not to. Thus we waived the APS and accepted the risk with our eyes open.

Similarly, in Claim No. NOD082820, the insured failed to disclose an extensive history of heart disease but did disclose the name of two medical centers where he had been treated. Prudential paid the claim notwithstanding the misrepresentation:

> [B]ecause it was decided at issue to waive a Special Class 3 rating based on the insured's cardiac abnormalities you are recommending that we pay the claim. I agree. As I see it, there is no basis for a misrepresentation defense. At underwriting time we were on notice.... Underwriting ... did not pursue obtaining his medical records.

Whether the "cumulative effect" of the information Prudential possessed, particularly in light of its above-discussed practice, was sufficient to put Prudential on notice to conduct further inquiry into Lynn's past medical conditions, which, if done reasonably, would have led it to discover the conditions and treatments on which it bases its rescission argument, po-

ses a genuine issue of material fact that cannot, in our view, be decided as a matter of law. *See Trawick v. Manhattan Life Ins. Co.*, 447 F.2d 1293, 1296 (5th Cir.1971).

Reversed and remanded for further proceedings consistent with this opinion.

HALL, C.J., HOWE, Associate C.J., and STEWART and DURHAM, JJ., concur.

ZIMMERMAN, J., having disqualified himself, does not participate herein; BILLINGS, Court of Appeals Judge, sat.